LOUIS E. GARFINKEL, ESQ.
Nevada Bar No. 3416
LEVINE GARFINKEL & ECKERSLEY
8880 W. Sunset Road, Suite 290
Las Vegas, Nevada 89148
(702) 735-0451
(702) 735-2198  (Fax)
Attorneys for Petitioner Seth Shaw

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| SETH SHAW,<br><br>                     Petitioner,<br><br>vs.<br><br>ROI LAND INVESTMENTS LTD.,<br><br>                     Respondent. | Case No.: 2:17-cv-01165-JAD-VCF<br><br>**PETITIONER'S MEMORANDUM IN OPPOSITION TO RESPONDENT'S MOTION TO DISMISS AND VACATE ARBITRATION AWARD** |

Petitioner, Seth Shaw ("Petitioner"), hereby files this Memorandum in Opposition to Respondent's Motion to Dismiss and Vacate Arbitration Award and in support thereof states as follows:

### I.        INTRODUCTION

After an arbitration trial, Petitioner obtained a successful arbitration award in the amount of $861,859.57 against Respondent, ROI Land Investments, LTD ("Respondent"). The reasoning for the award was explained in detail in an eighteen (18) page Partial Final Award, which awarded Petitioner damages in the amount of $755,125.00 and a Final Award which awarded Petitioner $103,109.57 in attorneys' fees (collectively, the "Arbitration Award"). The Arbitration Award is attached hereto as Exhibit "A".

Petitioner then filed his Petition for Conformation of Arbitration Award and Entry of Judgment (the "Petition") seeking to have the arbitration award confirmed and converted to a

judgment. In a transparent attempt to re-litigate the underlying arbitration trial and delay payment of the arbitration award, Respondent has filed a Motion to Dismiss and Vacate Arbitration Award (the "Motion").  Respondent's position is that the Arbitration Award was completely irrational and that it exhibits a manifest disregard of applicable law. The completely irrational standard is extremely narrow and is satisfied only where the arbitration decision fails to draw its essence from the contract at issue. *Collins v. Chicago Inv. Grp., LLC*, No. 2:11-CV-01105-ECR, 2012 WL 938725, at *1 (D. Nev. Mar. 20, 2012) citing *Bosack v. Soward,* 586 F.3d1096, 1106 (9th Cir.2009). With regard to demonstrating a manifest disregard of the law, "the moving party must show that the arbitrator understood and correctly stated the law, but proceeded to disregard the same." *Collins*, No. 2:11-CV-01105-ECR, 2012 WL 938725, at *1 quoting *Collins v. D.R. Horton, Inc.,* 505 F.3d 874, 879 (9th Cir.2007). The Motion fails to argue that the Arbitration Award satisfies these strict requirements for the Court to vacate the award or dismiss this action. Therefore, Respondent's Motion must be denied.  This is a bad faith delay tactic by Respondent.

## II.    LEGAL STANDARD

The review of an arbitration award is limited by the Federal Arbitration Act ("FAA"), which "enumerates limited grounds on which a federal court may vacate, modify, or correct an arbitral award." *Kyocera Corp. v. Prudential–Bache Trade Servs., Inc.,* 341 F.3d 987, 994 (9th Cir.2003).  "Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award under the statute, which is unambiguous in this regard." *Id.* Under § 9 of the FAA, "a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11." *Hall St. Assocs., L.L.C., v. Mattel, Inc.,* 552 U.S. 576, 128 S.Ct. 1396, 1402, 170 L.Ed.2d 254 (2008) (citing 9 U.S.C. § 10(a)).

"Under the FAA, [ ] the reform of arbitration awards, including the severe remedy of vacatur, is limited by those grounds established by Congress in the [FAA]." *Sunrise Trust v. Morgan Stanley & Co. Inc.*, No. 2:12-CV-944 JCM PAL, 2012 WL 4963766, at *3 (D. Nev. Oct. 16, 2012), aff'd, 552 F. App'x 685 (9th Cir. 2014) quoting *Lagstein v. Certain Underwriters at Lloyd's, London*, 607 F.3d 634, 647 (9th Cir.2009); *Stark v. Sandberg, Phoenix & von Gontard, P.C.*, 381 F.3d 793, 798 (8th Cir.2004) ("When reviewing an arbitral award, courts accord an extraordinary level of deference to the underlying award itself...."); *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir.1995) ("In fact, the standard of review of arbitral awards is among the narrowest known to the law."); *Eljer Mfg., Inc. v. Kowin Dev. Corp.*, 14 F.3d 1250, 1253–54 (7th Cir.1994) ("[W]e will set aside an arbitrator's decision if in reaching his result, the arbitrator deliberately disregards what he knows to be the law."); *Wall Street Assocs., L.P. v. Becker Paribas Inc.*, 27 F.3d 845, 848 (2d Cir.1994) (noting "the FAA's strong presumption in favor of enforcing arbitration awards.").

As to the limited circumstances for Court intervention compared to the "must" standard for confirming an award, "manifest disregard of the law" is more than an error in interpretation or application of the law, but rather occurs when it is "clear from the record that the arbitrators recognized the applicable law and then ignored it." *Estate of Wildhaber ex rel. Halbrook v. Life Care Centers of Am., Inc.*, No. 2:10-CV-00015-MMD, 2012 WL 5287980, at *1 (D. Nev. Oct. 23, 2012) quoting *Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.*, 44 F.3d 826, 832 (9th Cir.1995).

## III.   **LEGAL ARGUMENT**

### A.   THE ARBITRATION AWARD DID NOT MANIFESTLY DISREGARD THE APPLICABLE LAW

It is clear, both in the Motion and the Arbitration Award, that there is no "manifest disregard of the law". The Motion attempts to argue with the Arbitrator's interpretation of the applicable law and contest the reasoning in the Arbitration Award rather than referencing any

intentional disregard of the law by the Arbitrator. More specifically, the Motion is admittedly a reiteration of the arguments made in Respondent's Post-Hearing Brief that was considered by the Arbitrator before issuing the Arbitration Award. *See* Exhibit "B".  Respondent literally copied pages of argument from the Respondent's Post-Hearing Brief in the Motion. *See,* Motion pages 5-9.  Respondent's attempt to re-argue is not even proper grounds for a rehearing motion.

A finding of "manifest disregard ... requires 'something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand and apply the law.'" *Collins v. D.R. Horton, Inc.,* 505 F.3d 874, 879 (9th Cir.2007) (quoting *San Martine Compania De Navegacion, S.A. v. Saguenay Terminals Ltd.,* 293 F.2d 796, 801 (9th Cir.1961)). "[T]o demonstrate manifest disregard, the moving party must show that the arbitrator 'underst[oo]d and correctly state[d] the law, but proceed[ed] to disregard the same.'" *Collins,* 505 F.3d at 879 (quoting *San Martine Compania De Navegacion,* 293 F.2d at 801) (alterations in *Collins*). "[T]here must be some evidence in the record, other than the result, that the arbitrators were aware of the law and intentionally disregarded it." *Bosack v. Soward*, 586 F.3d 1096, 1104–05 (9th Cir. 2009) quoting *Lincoln Nat'l Life Ins. Co. v. Payne,* 374 F.3d 672, 675 (8th Cir.2004).

The Motion is desperate to re-litigate every faction of the underlying arbitration trial, however, not once does the Motion reference any record evidence that was intentionally disregarded by the arbitrator or an instance where the arbitrator understood the correct law and decided to disregard its applicability. The Motion is absent from reference to a specific trial exhibit or an exhibit to the Motion that was disregarded by the arbitrator.  Moreover, there is not a citation to a case or statute that was *intentionally* disregarded by the arbitrator.  The only evidence provided by Respondent to advance its argument is the Arbitration Award itself, which is therefore fatal to Respondent's claim. However, even a cursory analysis of the Arbitration Award conclusively demonstrates that the Arbitrator seriously considered the arguments and evidence

presented by counsel, the witness testimony, and the applicable case law relevant to the legal issues raised by the parties. Respondent's dissatisfaction with the outcome of the arbitration trial is insufficient to vacate the Arbitration Award. *See, QSIndustries, Inc. v. Mike's Train House, Inc.*, No. CIV. 01-0119-JO, 2001 WL 34736211, at *3 (D. Or. Apr. 17, 2001) (stating that a party cannot seek redress in the District Court simply because it is unhappy with the decision of the arbitrator).

### a. THE ARBITRATION AWARD CAREFULLY ANALYZED THE ISSUE OF WHETHER RESPONDENT ACTED AS AN UNREGISTERED BROKER

Because numerous issues related to Respondent's counterclaim and affirmative defense of non-performance were disposed of at the arbitration trial "the sole remaining legal issue is whether the Agreement was illegal and void or voidable due to Shaw's alleged failure to comply with applicable securities laws" *See* Partial Final Award at 2. The entirety of the Arbitration Award is centered on this issue and Respondent's Motion is simply a re-argument against the Arbitrator's reasoned conclusions and not an argument that the Arbitrator manifestly disregarded the law.

The Motion recycles the same issues and case law as the Post Hearing Brief with respect to the issue of Petitioner's status as an unregistered broker. Because Respondent did not receive a favorable ruling from the arbitrator it now uses the *exact same language* from the Post Hearing Brief in the hope that this Honorable Court will reach a different legal and factual conclusion. That is not the duty of this Honorable Court or the purpose of a vacatur pursuant to 9 U.S.C. §10(a).

The Arbitration Award directly addresses all of the arguments made by Respondent and ultimately reached a different conclusion based on the testimony, exhibit evidence and law presented. Even if this application of the law was erroneous, which Petitioner believes was correct, it would not provide this Court with the ability to vacate the Arbitration Award. An

arbitrator's award will not be vacated because of erroneous findings of fact or misinterpretations of law. *Am. Postal Workers Union AFL-CIO v. U.S. Postal Serv.,* 682 F.2d 1280, 1285 (9th Cir. 1982).

The Arbitration Award focuses first on the language of the parties' Agreement, and then concludes that the Agreement contains nothing that would require Petitioner to act as a registered broker because Petitioner is "simply providing introductions to business acquaintances who might be interested in investing in the business or giving general advice based on years of running his company." *See* Partial Final Award at 8-9. The Arbitration Award then specifically recognizes Respondent's failure to support its argument regarding licensure with sufficient evidence to contradict Petitioner's testimony and exhibit evidence. *Id* at 10. The Arbitration Award definitively concluded that "there was no illegal conduct that could serve as a basis for voiding the contract." *Id.* at 6. Respondent failed to satisfy its affirmative defense burden of proof that Petitioner was acting as an unlicensed broker. Respondent's lack of sufficient evidence at the arbitration trial does not now permit it to reargue its case before this Honorable Court.  We note that the Motion does not even reference any evidence to contradict Petitioner's testimony and evidence heard at the trial.

The Arbitration Award then specifically cites to the case *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011) as the legal basis for reaching its conclusion that Petitioner was not engaged in broker activities. *Id.* at 10. The Motion cannot state that the Arbitration Award was unreasoned or that the Arbitrator manifestly disregarded any applicable law. Respondent simply disagrees with the outcome. The Motion should not allow Respondent a second attempt at making the same argument regarding broker activities simply because the case it presented at the arbitration trial was inadequate.

In light of the Motion's failure to cite or attach any record evidence of manifest disregard

of the law in the Arbitration Award with respect to the issue of broker activity, the Motion should be denied.

**b.   THE ARBITRATION AWARD PROVIDED LEGAL JUSTIFICATION FOR THE TIME BAR TO THE SECTION 29(B) DEFENSE**

The Motion argues that the Arbitration Award was incorrect as to the holding that an affirmative defense under Section 29(b) is barred by a one year statute of limitations.  The Statute of Limitation position was merely a secondary reason for denial of Respondent's position, and therefore, would not even have been needed to be reached based on the prior determination of no improper activity by Petitioner. *See, A.G. Edwards & Sons, Inc. v. McCollough,* 967 F.2d 1401, 1403 (9th Cir.1992) (per curiam) (noting that "arbitrators are not required to state the reasons for their decisions.").  Essentially, the Arbitrator determined no wrongdoing, and then stated even if there was wrongdoing, the Statute of Limitations would have prevented Respondent's position.  *See* Partial Final Award at 12.  What this does show is the arbitrator's due care and diligence in going through the positions taken by the parties in making the Arbitration Award.

Respondent's argument in the Motion is purely one of a disagreement of legal interpretation and not one of manifest disregard by the Arbitrator. "Manifest disregard of the law" is more than an error in interpretation or application of the law, but rather occurs when it is "clear from the record that the arbitrators recognized the applicable law and then ignored it." *Estate of Wildhaber ex rel. Halbrook v. Life Care Centers of Am., Inc.,* No. 2:10-CV-00015-MMD, 2012 WL 5287980, at *1 (D. Nev. Oct. 23, 2012) quoting *Mich. Mut. Ins. Co. v. Unigard Sec. Ins. Co.,* 44 F.3d 826, 832 (9th Cir.1995).  The Arbitrator in reaching his decision regarding Section 29(b) relied upon the case *Alpha Capital v. Oxysure Systems,* 2016 WL 6766948 at *4 (S.D.N.Y. 2016) that held that an affirmative defense for Section 29(b) must be raised within one year. The Arbitration Award includes an excerpt of the holding of the case and the Arbitrator cites to numerous pieces of evidence demonstrating that Respondent knew that Petitioner was not a

licensed broker since 2014.

The Motion is an attempt by Respondent to have this Court not only reevaluate the Arbitrator's conclusion but to also find disagreement with the holding of another Federal district court. The Motion requests that this Court go far beyond the scope of its statutory analysis when considering vacating an arbitration award. Respondent cannot now argue that it presented correct alternative interpretations of the law which were then knowingly disregarded by the Arbitrator. The Arbitration Award already holds that Petitioner was not engaged in unlicensed broker activity making the consideration of the Section 29(b) defense unnecessary. However, Respondent's disagreement with the Arbitrator's application of the case law to the Section 29(b) defense is insufficient to satisfy the standard to vacate the Arbitration Award.

c.   THE ARBITRATION AWARD PROVIDED LEGAL JUSTIFICATION TO CONCLUDE THAT RESPONDENT WAS NOT AN UNWILLING INNOCENT PARTY

Again, a secondary basis for denial of Respondent's defense under unclean hands of the Respondent, *if* the Petitioner did any wrongdoing, which was already decided properly.  The Motion uses the exact same reasoning to argue that vacating the Arbitration Award is proper because the Arbitrator held that Respondent could not invoke a Section 29(b) defense as it was not an unwilling innocent party (similar to unclean hands).

The Arbitration Award included an analysis of the issue even though it was unnecessary and would not have changed the holding. In conducting its analysis, the Arbitrator relied upon the case *Buffalo Forge v. Ogden*, 555 F. Supp. 892, 906 (W.D.N.Y 1983) to determine that Respondent should not be permitted to raise the "unwilling innocent party" defense to void the Agreement between the parties. The Motion again takes issue with the reliance of this case law and attempts to distinguish the holding.  Respondent once again requests that this Court engage in an analysis of the Arbitrator's legal interpretation and not any true manifest disregard of the law.

Because the Motion sets forth no record evidence that the Arbitrator understood the correct law only to then explicitly disregard it in the Arbitration Award with respect to the Section 29(b) defense, the Motion must fail.

**d.** **THE ARBITRATOR DID NOT EXCEED HIS POWERS WITH RESPECT TO THE PETITIONER'S DAMAGES**

The Motion challenges the Arbitrator's power to award damages by attempting to excuse Respondent's failure to provide any rebuttal evidence regarding damages. This argument is unsupported by facts, evidence or case law.

On the issue of damages the Arbitration Award is explicit in stating that Respondent failed to provide any evidence rebutting Petitioner's claim for damages and that "[i]n the absence of any rebuttal evidence, the Arbitrator finds Shaw's more conservative projection credible." *See* Partial Final Award at 15. Respondent also did not provide any contrary evidence regarding the interest rate in Nevada. *Id.* The Arbitration Award states that Petitioner used an exhibit to demonstrate the trading value of Respondent's stock and that the Arbitrator then applied the most conservative calculation when awarding damages. *Id.* The Arbitration Award states that it is accepting the damages calculation, in part, because of the total absence of any rebuttal evidence or argument presented by Respondent. *Id.*

An arbitrator only exceeds their power when they manifestly disregard the law or issue an award that is completely irrational. *Bosack*, 586 F.3d 1096 at 1104. In the present case, neither of those circumstances occurred and the Arbitrator awarded damages based upon the only evidence (exhibit and testimony), which was the conservative calculation of Petitioner.

**B.** **THE ARBITRATION AWARD IS WELL-REASONED AND NOT COMPLETELY IRRATIONAL**

The Motion cannot credibly claim that the Arbitrator's decision is irrational because the Arbitration Award is undeniably based upon the underlying Agreement between the parties. An

award may be vacated if it is "completely irrational." *Comedy Club, Inc. v. Improv W. Assocs.,* 553 F.3d 1277, 1288 (9th Cir. 2009). This "standard is extremely narrow and is satisfied only 'where [the arbitration decision] fails to draw its essence from the agreement.'" *Id.* citing *Hoffman v. Cargill Inc.,* 236 F.3d 458, 461–62 (8th Cir.2001).

An award "draws its essence from the agreement if the award is derived from the agreement, viewed in light of the agreement's language and context, as well as other indications of the parties' intentions." *Bosack,* 586 F.3d 1096 at 1106 quoting *McGrann v. First Albany Corp.,* 424 F.3d 743, 749 (8th Cir.2005); *see also Coast Trading Co., Inc., v. Pac. Molasses Co.,* 681 F.2d 1195, 1197 (9th Cir.1982) (holding that an "arbitrator is confined to the interpretation and application of the parties' agreement" and that an "award is legitimate only so long as it draws its essence from the ... agreement") (quoting *United Steelworkers of Am. v. Enter. Wheel and Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) (internal quotation marks omitted)).

Under this standard of review, the Court does not "decide the rightness or wrongness of the arbitrators' contract interpretation, only whether the panel's decision 'draws its essence' from the contract." *Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp.,* 935 F.2d 1019, 1024 (9th Cir.1991) (quoting *New Meiji Market v. United Food & Comm'l Workers Local Union 905,* 789 F.2d 1334, 1335 (9th Cir.1986)). The Court will not vacate an award simply because it might have interpreted the contract differently. *Id*

In the Discussion section of the Arbitration Award, the Arbitrator begins his analysis by "starting with the language of the Agreement." *See* Partial Final Judgment at 7. The Arbitration Award then excerpts numerous sections of the Agreement and applies a legal analysis to the language contained in the Agreement.  It is undisputed that the Arbitration Award took its essence from the Agreement and used it as the basis for the analysis and holding. The Motion does not

even contest this point but repeatedly refers to the decision as "completely irrational" without an explanation of what that statement means in the context of vacating an arbitration award or any relevant citations to authoritative case law. Because it is evident that the Arbitration Award took its essence from the Agreement between the parties, the Arbitration Award is not completely irrational and cannot be vacated on that basis. Because the Motion fails to present any substantive argument for either the "manifest disregard" or "completely irrational" standards it must be denied.

### C.  THE ARBITRATOR DID NOT COMMIT ANY MISCONDUCT

The Motion argues that the Arbitrator committed misconduct. Section 10(a) of the FAA permits a district court to vacate an arbitration award for arbitrator misconduct where "the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." The Motion argues that the misconduct is premised on considering arguments post-hearing brief that: (1) the Section 29(b) defense was time barred; and (2) that Respondent was not an unwilling innocent party. As discussed above, because the Arbitrator found that Petitioner was not engaged in broker activities those issues would have no effect on the outcome of the Arbitration Award. Moreover, the Motion raises no evidence of any misconduct by the Arbitrator.  The post-hearing briefing was part of the argument (in place of full closing argument), which both sides participated in fully and without Respondent raising any issues to the Arbitrator.

The crux of the argument in the Motion is that Respondent was deprived of the right to brief these issues because of the Arbitrator's briefing schedule (five days for the response) and page limitations (response of three pages).  Respondent and Petitioner participated in the discussion with the Arbitrator about the schedule and page limitations, which was all based on the

fact this was a one day hearing. Bottom line, Respondent never requested an extension of time to brief these issues[1] or leave to file a brief in excess of the original page limitations. Moreover, Respondent did not even footnote (although he heavily footnoted the Response to avoid the double space and font restrictions) any issue of wanting additional argument or to provide additional case law citations to support their position without argument due to space limitation.

There is no record evidence or support for Respondent to state they were unfairly restricted. Above are obvious examples of how Respondent could have raised an issue timely, if it *was* actually an issue at the time (before they lost). *See* Exhibit "C".

The Motion does not even suggest what additional caselaw would have been added, if it had more pages and time.[2] Clearly, Respondent waived any opportunity to request additional time or pages to address these issues, and raising it for the first time in the Motion as an example of "arbitrator misconduct" is wholly inappropriate and not consistent with the law. The Arbitration Award still would not have been different had Respondent had the opportunity to additionally brief the two issues. Petitioner was under the same time and page restriction. Respondent cannot now for the first time state that it was unfairly prejudiced by any of the Arbitrator's actions to warrant an accusation of misconduct. As such, the Motion should be denied.

## IV.   CONCLUSION

The Motion completely disregards the applicable standards for vacating the Arbitration Award. Respondent does not cite to any record evidence other than the Arbitration Award to demonstrate that the Arbitrator manifestly disregarded the law. The arguments presented by

---

[1] Respondent requested an extension in this case to respond to the Petition, so they are familiar with filing extensions.
[2] For Respondent to do the same in its Reply to this Response is clear sandbagging and should not be considered by this Court.

Respondent are all disagreements it has with the legal interpretation and application of the law that are insufficient to support a vacatur. Further, the Arbitration Award cannot be "completely irrational" as it explicitly is based upon the Agreement between the parties. Lastly, there was no misconduct by the Arbitrator because of the previously established briefing schedule and page limitations. The Motion incorrectly requests that this Honorable Court engage in a purely legal disagreement with the Arbitrator over the outcome of the Arbitration Award. Because the Motion fails to present any substantive basis for vacating the Arbitration Award it must be denied.

Dated this 14th day of July, 2017

LEVINE, GARFINKEL & ECKERSLEY

By: Louis E. Garfinkel
Louis E. Garfinkel, Esq.
Nevada Bar No. 3416
8880 W. Sunset Road, Suite 290
Las Vegas, Nevada 89148
Attorneys for Petitioner Seth Shaw

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I certify that I am an employee of Levine Garfinkel & Eckersley and that on this 14th day of July, 2017, I served a true and correct copy of the foregoing **PETITIONER'S MEMORANDUM IN OPPOSITION TO RESPONDENT'S MOTION TO DISMISS AND VACATE ARBITRATION AWARD** through the court's electronic filing website (ECF) to:

Patrick E. Ogle, Esq.
Law Office of Patrick E. Ogle
3502 South Virginia Street, Suite A8
Reno, NV  89502
*Attorneys for Respondent*

Cory Hershman, an Employee of
LEVINE GARFINKEL & ECKERSLEY

# EXHIBIT "A"

# EXHIBIT "A"

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
INTERNATIONAL ARBITRATION TRIBUNAL

SETH SHAW,

                    **Claimant,**

    **vs.**                              **Arbitration No. 02-15-0005-6446**

ROI LAND INVESTMENTS, LTD.,

                    **Respondent.**

## PARTIAL FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and effective as of May 1, 2014, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, PARTIAL FINAL AWARD, as follows:

### Procedural Background

This is a claim by Claimant Seth M. Shaw ("Shaw) against ROI Land Investments Ltd. ("ROI") for failure to deliver to him 500,000 shares of stock in ROI pursuant to a Consulting Agreement (the "Agreement") entered into by the parties on May 1, 2014. Respondent originally asserted (1) a counterclaim for fraudulent inducement; (2) an affirmative defense of failure

1

to perform under the Agreement; and (3) a further defense that the Agreement is void because Mr. Shaw was acting as an unregistered broker in violation of applicable securities laws.

A one-day hearing without a stenographer was held on January 20, 2017. Shaw testified on his own behalf and introduced certain documents. ROI called no witnesses but cross-examined Mr. Shaw and introduced other documents. At the end of the hearing day, Shaw moved for judgment on ROI's counterclaim for fraudulent inducement and affirmative defense of non-performance. The Arbitrator granted the motion due to failure of proof on both. Thus, the sole remaining legal issue is whether the Agreement was illegal and void or voidable due to Shaw's alleged failure to comply with applicable securities laws.

The Arbitrator must also decide on the award of attorneys' fees. The arbitration clause in this case provides, among other things, that "the prevailing party shall be entitled to reasonable attorney's fees to be fixed by the arbitrator." (Agreement, Para.10j).

The parties have agreed that the arbitrator will issue this interim award deciding the securities-law issue. The parties will then make submissions regarding the appropriate amount of attorneys' fees to be awarded to the prevailing party. Thereafter, the Arbitrator will determine the proper amount

of attorneys' fees and issue a final award that will contain the language and findings herein, as well as his additional findings on attorneys' fees.

## Relevant Case Law

Section 15(a)(1) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") makes it unlawful to carry out certain transactions in securities unless one is registered as a broker or dealer. Section 29(b) of the Exchange Act further provides that a contract made in violation of any provisions of the Exchange Act shall be void.

Section 3(a)(4) of the Exchange defines "broker" as "any person engaged in the business of effecting transactions in securities for the accounts of others." Because the Exchange Act does not define "effecting transactions" or "engag[ing] in the business," a variety of factors have been applied to determine whether a person qualifies as a broker.

The most frequently cited factors were identified in *SEC v. Hansen*, 1984 U.S. Dist. LEXIS 17835, at *26 (S.D.N.Y., April 6,1984). These factors include:

> whether a person (1) works as an employee of the issuer, (2) receives a commission rather than a salary, (3) sells or earlier sold the securities of another issuer, (4) participates in negotiations between the issuer and an investor, (5) provides either advice or a valuation as to the merit of an investment, and (6) actively (rather than passively) finds investors.

In determining whether one is acting as a *broker*, who requires registration, or a *finder*, who does not, courts have looked particularly at certain factors. In *Foundation Ventures, LLC v F2G, Ltd.*, 2010 WL 3187294 *6 (S.D.N.Y. 2010), the court noted:

> State and federal courts in New York recognize a difference between brokers and finders. "[A] finder finds potential buyers or sellers, stimulates their interest, and brings parties together, while a broker brings the parties to an agreement on particular terms." *Jones v. Whelan,* No. 99 Civ. 11743, 2002 WL 485729, at *7 (S.D.N.Y. Mar.29, 2002) ...; *Warshay v. Guinness PLC*, 750 F. Supp. 628, 636 (S.D.N.Y.1990) ("[F]inders, unlike brokers, do not play a role in the negotiation, drafting and signing of a purchase agreement and closing documents."), aff'd, 935 F.2d 1278 (2d Cir.1991); *Ne. Gen. Corp. v. Wellington Adver., Inc.,* 82 N.Y.S.2d 158, 162–63 604 N.Y.S.2d 1, (1993) ("A finder is not a broker, although they perform some related functions....The finder is required to introduce and bring the parties together, without any obligation or power to negotiate the transaction, in order to earn the finder's fee. While a broker performs that same introduction task, the broker must ordinarily also bring the parties to an agreement").

In *SEC v Kramer*, 778 F.Supp.2d 1320, 1334 (M.D. Fla. 2011), the court stated that:

> "[t]he factors articulated in *Hansen* ... [a]re not designed to be exclusive," *S.E.C. v. Benger*, 697 F.Supp.2d 932, 945 (N.D. Ill. 2010) (Lefkow, J.), and some factors ... appear more indicative of broker conduct than others. For example, *S.E.C. v. Bravata*, 2009 WL 2245649, *2 (E.D. Mich. 2009) (Lawson, J.), describes "[t]he most important factor in determining whether an individual or entity is a broker" as the "regularity of participation in securities transactions at key points in the chain of distribution." ...; *See also S.E.C. v. Kenton Capital,*

*Ltd.*, 69 F.Supp.2d 1, 12–13 (D.D.C.1998) (Kollar–Kotelly, J.) (describing "regularity of participation" as one of the primary indicia of "engag[ing] in the business"). *Cornhusker*[1] describes "transaction-based compensation" as "one of the hallmarks of being a broker-dealer." 2006 WL 2620985 at *6 (stating that "[t]he underlying concern has been that transaction-based compensation represents a potential incentive for abusive sales practices that registration is intended to regulate and prevent.").

There is a one-year statute of limitations for any implied cause of action or defense under Section 29(b) of the Exchange Act. *Alpha Capital v. Oxysure Systems*, 2016 WL 6766948 *4 (S.D.N.Y. 2016).  This one-year statute runs from the date when one through the exercise of reasonable diligence could have discovered the fraud, *Id.*  Ignorance of the law is no excuse. *Id.*

Although Section 29(b) refers to contracts in violation of its terms as being "void," the U.S. Supreme Court has held that such contracts are merely "voidable at the option of the innocent party. *Mills v Elec. Auto-Lite*,  396 U.S. 375, 387-88, 90 S. Ct. 616 (1970).  *See also, Foundation Ventures, LLC v F2G, Ltd.*, 2010 WL 3187294 at *6 and cases cited therein.

In *Foundation Ventures*, the plaintiff argued that the defendant could not void the contract under Section 29(b) because the defendant knowingly agreed to the terms of the contract and, therefore, was not an unwilling

---

[1] *Cornhusker Energy Lexington, LLC v. Prospect St. Ventures*, 2006 WL 2620985, *6 (D.Neb.2006)

innocent party entitled to void it.  The defendant argued in response that the unwilling innocent standard was inapplicable because it applied solely to the question of whether an unwilling innocent party could enforce the contract despite its unlawfulness, and not to whether a defendant must be an unwilling innocent party in order to defend against a plaintiff's enforcement of an illegal contract. The court stated that it did not have to decide this issue because it found that the plaintiff was at all times acting merely as a finder and not a broker and, therefore, there was no illegal conduct that could serve as a basis for voiding the contract.

Although the *Foundation Ventures* court did not reach the issue of whether only an unwilling innocent party can defend against enforcement of an allegedly illegal contract, the court in *Buffalo Forge v Ogden*, 555 F. Supp. 892, 906 (W.D.N.Y 1983) did, holding:

> Under section 29(b), only an "unwilling innocent party" to a contract may attack it. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387, 90 S. Ct. 616, 623, 24 L.Ed.2d 593 (1970). Buffalo Forge willingly entered into the questioned contract and knew of all the facts which Ampco now claims constitute "manipulation," and thus, it may not invoke the provisions of section 29(b) to challenge the contract. *Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F.Supp. 286, 291 (D.Conn.1979); *Drasner v. Thomson McKinnon Securities, Inc.*, 433 F.Supp. 485, 502 (S.D.N.Y.1977).

### Discussion

ROI contends that the Agreement on its face and Shaw's conduct demonstrate that he was illegally acting as a broker without being registered under Section 29(b), and, therefore, the contract is void and unenforceable.

Shaw contends that (1) its actions were those of a finder, not a broker, and, therefore, not illegal; (2) even if it were illegal, ROI had a one-year statute of limitations period to assert its claim of illegality, and it did not do so; and (3) even if it were illegal, ROI is not an "unwilling innocent party" entitled to void the contract.

Starting with the language of the Agreement, the Arbitrator notes that the Agreement on its face states that Shaw is not a registered broker and is not required to be:

> WHEREAS, the Company recognizes that the Consultant is not in the business of stock brokerage, investment advice, activities which require registration under either the Securities Act of 1933 (hereinafter "the Act") or the Securities and Exchange Act of 1934 (hereinafter "the Exchange Act"), underwriting, banking, is not an insurance Company, nor does it offer services to the Company which may require regulation under federal or state securities laws;

Section 1 on the first page then lays out Shaw's general duties as follows:

> 1. DUTIES AND INVOLVEMENT.
> The Company hereby engages Consultant to provide the following services:

7

-Assist the Company with the introduction of value added investor, potential strategic and business development partners and acquisition targets.
-Assist the Company in developing Corporate Structures, Management Strategies, business development.
-Other services as mutually agreed to by The Company and Consultant

Section 5, a key provision, then provides, in pertinent part:

5. COMPENSATION AND PAYMENT OF EXPENSES
***
In respect to capital raising in favor of the Company, that is directly attributed to the efforts of the Consultant the Company agrees to compensate the Consultant as follows:

> The Consultant shall receive no monthly retainer unless mutually agreed and signed in writing by both parties. The Consultant shall receive 500,000 Shares upon signing of this agreement, such shares shall be considered fully earned upon issuance.

ROI contends that the language of Sections 1 and 5 expressly require unlicensed broker activities.  With respect to Section 1, it notes that the agreement to assist with "the introduction of value added investor" and "potential strategic and business development partner" indicates that Shaw was to function as a broker or investment banker.  The Arbitrator, however, finds nothing in the language of Section 1 that is not also consistent with Shaw's simply providing introductions to business acquaintances who might be interested in investing in the business or giving general advice based on

his years of running his own company.  Introductions to acquaintances,

without more, do not make one a broker, as opposed to a finder.  *Foundation*

*Ventures,* 2010 WL3187294 at *6.

The language of Section 5 is unusual in that it provides for 500,000

shares of stock upon signing of the Agreement without further provision of

any services.  ROI contends that when one adds to this grant the introductory

language of Section 5, which indicates that the stock grant is "[i]n respect to

capital raising," one can conclude that the stock grant was really a disguised

form of compensation in return for unlicensed brokerage activities.[2]  The

problem with this argument is that even if the grant of stock was for "capital

raising," it still does not prove, by itself and without other evidence of the

actual activities of Shaw, that the "capital raising" consisted of anything more

than merely making introductions, which would not make Shaw anything

more than a "finder" under the above-noted case law.

With respect to the actual activities of Shaw, ROI promised in its

opening statement to show that Shaw's conduct was part of some conspiracy

with the attorney for ROI, that the stock grant was hidden compensation for

---

[2] Shaw's counsel stated that the language regarding the stock grant was cut and pasted
into another form contract and that is the reason why the introductory language was
inadvertently left in place.  There was no proof offered of this, however, other than what
one can observe on the face of the document regarding the different type size and
spacing of the language regarding the stock grant.

brokerage activities, and that Shaw had engaged in a pattern of similar deals over the years, in essence making a career out of unlicensed brokerage activities.

The proof, however, did not live up to the promise of the opening. As noted, ROI produced no witnesses. The sole witness for either side was Shaw, who testified that he simply acted as a finder in making introductions to various business contacts and that he did not participate in any negotiations, drafting, or signing of closing documents or deal terms. On cross-examination, he testified that he never presented investment deal terms, a purchase agreement or private placement memorandum to any potential investor in ROI. Various exhibits supported his contention that all he did was made introductions. *See, e.g.,* Exhibits 1, 10, 15, and 22. There was no rebuttal to the foregoing testimony.

Nor did ROI present evidence that Shaw participated in the types of activities emphasized as evidence of broker conduct in the *SEC v. Kramer* case, noted above. There was no testimony that he engaged in "transaction-based compensation" (i.e., his compensation was a one-time grant of stock, not payments based on investment deals closed), or that he participated at "key points in the chain of distribution" (i.e., the only testimony was that he merely made introductions) or that he "regularly" participated in brokerage

type activities.  The only situation in which there was testimony that he was involved in actual investment type decisions involved a company of which he was the long-time CEO.  There was no testimony of substance regarding a pattern or "regularity" of acting as an advisor to other companies like ROI.

The one and only document that was damaging to Shaw's case was a redacted email setting forth the terms of a proposed settlement of the current lawsuit.[3]  The terms included the following:

C.     I will retain 60% of all net proceeds and 40% will be sent back to the Company as per instruction.

D.     I will agree to a price floor of $1.55. as per my discussion with Mr. Treminio with a better understanding of the Company's predicament. In addition, I am prepared to assist the Company with any ongoing raises.

E.     No proceeds shall be disbursed without a dual signature from a Company designee.  I will fully honor any financial agreements, so in actuality a second signature isn't even necessary.

F.     I shall receive a consulting agreement moving forward that shall provide me with compensation based upon successful Capital raised and success in broadening the shareholder base via institutional market support. Specific language shall be used to clarify these points.

G.     The Company shall agree to pay for a trip to Istanbul, Turkey within 90 days (my recommendation is that myself, Mr. Treminio, Mr. Germain, and Mr. Horiguci attend) to meet with Franklin Templeton Fund (managing director Erman Kalkandelen). Franklin Templeton is the 5th biggest mutual fund in the world and Mr. Kalkandelen

---

[3] This email was introduced over the objection that it constituted confidential, settlement negotiations.

manages $3 Billion and is potentially interested in investing
in ROI at this time. He is also not opposed to potentially
taking a position in the open market at this time.

This proposed settlement was never agreed to, however, and, thus,
there is no evidence that any of the suggested activity by Shaw was ever
carried out. Nonetheless, it is a disturbing proposal, which might, together
with other evidence, indicate that Shaw was really engaged in illegal
brokerage activities under his existing agreement with ROI. The problem is
that there was no other evidence. A mere proposal for the future, without
more, cannot prove what Shaw was actually doing in the past or that such
past conduct constituted unlicensed activity of a broker.

The burden of proof is on ROI to prove that Shaw was illegally acting
as an unlicensed broker. Despite the suspicions raised by the above proposal,
ROI failed to prove any actual conduct that constituted illegal brokerage
activity. Therefore, the Arbitrator is compelled to find that ROI has failed to
sustain its burden of proving that its Agreement to grant stock to Shaw is
void.

Moreover, as noted, there is a one-year statute of limitation for any
implied cause of action under Section 29(b) of the Exchange Act. In *Alpha
Capital v. Oxysure Systems*, 2016 WL 6766948 at *4 (S.D.N.Y. 2016), the

court barred respondent from basing any defense on an implied cause of action under Section 29(b) because of the passage of more than one year:

> As Defendants admit that they were aware that Kluger was not a licensed broker-dealer in December 2013, the one-year statute of limitations began running no later than December 2013. Thus, Defendants are barred from raising any defense based on an implied right of action under Section 29(b) of the Exchange Act.

*Id.* at *4.

Here, ROI, likewise, asserts an affirmative defense that Shaw's claim for damages is barred because he is not a licensed broker-dealer. But, as in *Alpha Capital*, this claim is barred by the one-year statute of limitations. As noted above, the Agreement states in the "Whereas" clause on page one that Shaw is not in the stock brokerage business or engaged in any other activities that require registration under the Exchange Act. The Agreement was signed on May 1, 2014, well over a year ago. At no time within one year of the signing of the Agreement, did ROI in any of its communications assert that the Agreement was void due to Shaw's failure to register as a broker. In fact, in an internal communication at the time of Shaw's demand back in June 2015, ROI stated its reason for not delivering the stock was "to reduce the expenses." *See,* Exhibit 39, Respondent 0034. Likewise, in June of 2015, in response to the demand from Shaw's lawyer to deliver the stock, ROI simply stated that the subject shares are "in dispute." *Id.* at Respondent 0037.

13

Accordingly, ROI is now barred by the one-year statute of limitation from asserting for the first time that the Agreement is void or voidable due to Shaw's failure to register as a broker under the Exchange Act.

Finally, Shaw asserts that ROI knowingly agreed to the terms of the contract, including the statement in the "Whereas" clause that Shaw was neither registered as a broker nor required to do so, and, therefore, was not an unwilling, innocent party entitled to void it. The evidence showed that ROI was a public-traded company on the United States stock market and would have had securities legal counsel. Its General Counsel at one point expressed an opinion that the shares of stock should be transferred to Shaw. Furthermore, Shaw testified that ROI knew he was not licensed and that the parties had been doing business together for years. This latter fact was also stipulated to as part of the Stipulated Facts submitted at the hearing.

Although ROI argues that the "unwilling innocent party" standard should only apply to the right of an innocent party, at its option, to enforce a contract despite its alleged illegality, and not to prevent a party from defending against a suit when an illegal contract is asserted against it. The case of *Buffalo Forge v. Ogden,* 555 F. Supp. at 906, cited above, however, permitted the plaintiff to preclude defendant from asserting the illegality of a contract on the grounds that it was not an "unwilling innocent party." ROI

has asserted no countervailing case law.  Accordingly, the Arbitrator also finds for this additional reason that ROI is barred from asserting its defense of illegality.

## Damages

During his testimony, Shaw used Exhibit 40, showing trading volume, to demonstrate how he could have sold his ROI stock, had it been issued when he made demand for it in June of 2015, without materially affecting the price. He explained that under one scenario he could have sold his stock over time at an average price of $1.85 per share.  Under a more conservative assumption, he showed how he could have sold his stock over a longer period of time at an average price of $1.40 per share.  ROI introduced no evidence to rebut these projections.  In the absence of any rebuttal evidence, the Arbitrator finds Shaw's more conservative projection credible.   Under this projection, he would have sold 500,000 shares at an average price of $1.40 for a total of $700,000.  Under governing Nevada law, Shaw asserts that he is entitled to interest at 5.25% on the $700,000.  Applying this rate from the date of his June 2015 demand until the hearing in this matter, results in interest in the amount of $55,125.  This, in turn, makes a grand total of $755,125.  There was no contrary evidence regarding the rate of interest in Nevada.  Accordingly, the Arbitrator finds that Shaw has proved damages,

including interest, of $755,125.

## Summary of Award

In sum, the Arbitrator finds and awards as follows:

1.      ROI has failed to prove that Shaw acted in an illegal capacity as a broker or dealer and that the Agreement is thereby void or voidable.

2.      ROI is further precluded from asserting that the agreement is illegal and thereby void or voidable because such a defense is barred by the one-year statute of limitations and is further barred by the fact that ROI is not an "unwilling innocent party" entitled to assert such a defense.

3.      Shaw is entitled to damages of $755,125.00 as a result of ROI's failure to issue 500,000 shares of stock to him on the date of his demand as required by the Agreement.

4.      Under the terms of the Agreement, Shaw is further entitled to recover his reasonable attorneys fees as the prevailing party. Shaw's proof of fees shall be submitted by March 15, 2017. ROI's response shall be submitted by March 17, 2017.  The Arbitrator will thereafter issue his final award by March 31, 2017.

5.      The Arbitrator reserves jurisdiction over all the issues in

connection with allocation and calculation of arbitration fees and costs to address them in Final Award.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Dated: February 23, 2017                    /s/ William H. Baker
                                            William H. Baker, Esq.
                                            Arbitrator

State of New York        )
                         )    SS:
County of Westchester    )

I, _William H. Baker_, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Partial Final Award.

Date _2/23/17_        _William H. Baker_ Arbitrator

State of New York        )
                         )    SS:
County of Westchester    )

On this _23rd_ day of _February_, 20_17_, before me personally came and appeared _William H. Baker_ to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
## INTERNATIONAL ARBITRATION TRIBUNAL

---

**SETH SHAW,**

       **Claimant,**

**vs.**                                                   **Arbitration No. 02-15-0005- 6466**

**ROI LAND INVESTMENTS, LTD.,**

       **Respondent.**

---

## FINAL AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and effective as of May 1, 2014, and having been duly sworn, and having duly heard the proofs and allegations of the parties, and having issued Partial Final Award on February 23, 2017, and having reserved jurisdiction to consider calculation and allocation of arbitration fees and costs, do hereby, issue FINAL AWARD, as follows:

### Procedural Background

On February 23, 2017, the Arbitrator issued a Partial Final Award in which he ruled that Claimant was entitled to recover $755,125.00 from Respondent on his breach of contract claim.

1

The contract provides for the award or reasonable attorneys fees to the winning party.  Therefore, the Arbitrator ordered Claimant to submit proof of his attorneys' fees by March 15, 2017, and Respondent to submit any opposition by March 17, 2017.  Claimant submitted its proof of attorneys' fees in the amount of $103,109.57 by March 15, 2017, but Respondent has submitted no opposition. The Arbitrator finds that the submitted attorneys' fees are reasonable.

<u>**Award**</u>

For the reasons stated above, I, the Undersigned Arbitrator, award as follows:

1. Partial Final Award dated February 23, 2017, which awarded Claimant damages including interest in the amount of $755,125.00, is hereby incorporated by reference. Respondent ROI Land Investments, Ltd. shall pay to Claimant Seth Shaw this awarded amount within (30) days from the date of transmittal of this Final Award to the parties unless already paid.

2. Within thirty (30) days from the date of transmittal of this Final Award to the parties, Defendant ROI Land Investments, Ltd. shall pay to Seth Shaw the sum of US$103,109.57 representing the awarded attorneys' fees.

3. The administrative fees and expenses of the International Centre for

2

Dispute Resolution, a division of the American Arbitration Association, totaling US$18,750.00 and the compensation and expenses of the arbitrator totaling US$17,580.00 shall be borne equally by the parties. Therefore, ROI Land Investments, Ltd. shall reimburse Seth Shaw the sum of US$3,625.00, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Seth Shaw.

4. This award is in full settlement of all claims and counterclaims submitted to this arbitration. All claims and counterclaims of this award, not expressly granted herein, are hereby denied.

I hereby certify that, for the purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: March 30, 2017      _____

                       William H. Baker, Arbitrator

State of NEW YORK    )
                     )   SS:
County of Westchester )

I, William H. Baker, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

_____3/30/17_____        _____
Date                          William H. Baker, Arbitrator

State of NEW YORK    )
                     )   SS:
County of Westchester )

On this 30th day of March, 2017, before me personally came and appeared William Baker, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

MARK F. SHKRELI
Notary Public, State of New York
No. 03-4996849
Qualified in Bronx County
Cert. Filed in Westchester County
Commission Expires 09/26/18

4

# EXHIBIT "B"

# EXHIBIT "B"

AMERICAN ARBITRATION ASSOCIATION

SETH M. SHAW,

Claimant,

vs.                                        Arbitration No. 01-15-0005-6446

ROI LAND INVESTMENTS, LTD.,

Respondent.

### Respondent's Post-Hearing Brief

Respondent ROI Land Investments, Ltd., a publicly traded Nevada corporation ("Respondent"), hereby asserts its surviving defenses against the claim for damages by Seth M. Shaw ("Claimant") in the aforesaid American Arbitration Association ("AAA") arbitration.  In support of its positions, Respondent contends that Claimant lacks the legal authority to engage in the unlicensed broker activities he contracted to perform for Respondent and those he routinely performs for other issuers and investors.  Therefore, the subject agreement is void as a matter of law, and he is prohibited from enforcing any alleged contractual payment obligations.

a.      **Applicable Legal Standards.**

It is unlawful for an unregistered broker to engage in the business of "effecting transactions in securities for the account of others."[1]  Courts look to the

---

[1]      *See* 15 U.S.C. § 78(o); 15 U.S.C. § 78c(a)(4).  Claimant also was not as registered an investment advisor with the SEC. An investment advisor is a person or a firm who is paid to advise others as to the value of a security or as to the advisability of investing in, purchasing, or selling securities. *See* Section 202(a)(11) of the Investment Advisors Act of 1940.

1

Securities and Exchange Commission (the "SEC") for persuasive authority as to what that phrase actually means.[2]   This authority has been summarized to include the following factors, although no single factor is dispositive:  (1) involvement in negotiations; (2) engaging in solicitations; (3) discussing details about securities or making recommendations; (4) compensation on a transaction-related basis; and (5) previous involvement in the sale of securities (the "ABA" factors).[3]

Courts consistently examine similar factors.  For example, in *SEC v Kramer*, the court inquired whether a person (1) works as an employee, (2) receives a commission, (3) sells the securities of another issuer, (4) participates in negotiations, (5) provides advice or a valuation as to the merit of an investment, or (6) actively (rather than passively) finds investors (the "K" factors).[4]

In *SEC v. Offill*, the court considered whether the "activities include[d]: [1] analyzing the financial needs of an issuer, [2] recommending or designing financial methods, [3] involvement in negotiations, [4] discussion of details of securities transactions, [5] making investment recommendations, and [6] prior involvement in the sale of securities" (the "O" factors).  No. 3:07-cv-1643-D, p.7 (N.D. Tex. Jan.

---

[2]       *See, e.g., SEC v. Kern*, 425 F.3d 143, 151 n.5 (2d Cir. 2005); *New York City Employees' Ret. Sys. v. SEC*, 45 F.3d 7, 13 (2d Cir. 1995); *Amalgamated Clothing & Textile Workers Union v. Wal-Mart*, 821 F. Supp. 877, 884 (S.D.N.Y. 1993).

[3]       *See* American Bar Association, *Report and Recommendations of the Task Force on Private Placement Broker-Dealers*, at p.16 (June 20, 2005).

[4]       778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011) (citing *SEC v. Hansen,* No. 83 Civ. 3692, at p.10 (S.D.N.Y. Apr. 6, 1984)).

26, 2012).   In *SEC v. Helms*, the court found that activities exceeded simple introductions because (1) the "[investor] and [broker] exchanged multiple email communications concerning the [] investment" and (2) "[the broker] conveyed [the investor's] questions about the investment to Sellers" (the "<u>H</u>" factors).   No. A-13-CV-01036, p.6 (W.D. Tex. Oct. 20, 2015).

In addition to the SEC and court analyses, FINRA Rule 1032(i) governs Claimant's exact conduct and requires Series 79 registration for 'investment banking representatives' whose activities involve "(1) advising on or facilitating debt or equity securities offerings through a private placement" *or* "(2) advising on or facilitating mergers and acquisitions" or "business combination transactions" (the "<u>S79</u>" factors).[5]   All, or only one, of these several factors may be sufficient for a finding of unlicensed broker activities that render a contract void.[6]

**b.**     <u>**The Agreement Expressly Required Unlicensed Broker Activities**</u>.

The Agreement explicitly states several illegal purposes for Claimant's retention.   Specifically, the Agreement states:

- The engagement is for "**capital raising**."   <u>Ex. B</u>, p.2.
  - o ABA#2 (engaging in solicitations), ABA#3 (discussing details about securities), K#6 (actively finding investors), and O#4 (discussing details of securities transactions).

---

[5]     *See also* FINRA Notice 09-41 (emphasis added).

[6]     Section 29(b) of the Securities Exchange Act of 1934 provides that contracts made in violation of any provision of the Act or rule promulgated thereunder are "void"--not simply voidable. *See* 15 U.S. Code § 78cc(b).

- **"[I]n respect to capital raising . . . the Company agrees to compensate the Consultant.**" <u>Ex. B</u>, p.2.

  o ABA#4 (compensation on a transaction-related basis) and K#2 (receives a commission).

- Claimant agreed to "[a]ssist [] with the **introduction of value added investor.**" <u>Ex. B</u>, p.1.

  o ABA#2 (engaging in solicitations), K#6 (actively finding investors), and S79#1 (facilitating securities offerings, including origination).

- Claimant agreed to "[a]ssist [] with . . . **potential strategic and business development partners** and **acquisition targets.**" <u>Ex. B</u>, p.1.

  o S79#2 (advising on or facilitating mergers and acquisitions or business combination transactions).

- Claimant agreed to "[a]ssist [] in developing **Corporate Structures**, Management Strategies, [and] business development." <u>Ex. B</u>, p.1.

  o S79#2 (advising on or facilitating financial restructurings and corporate reorganizations).

These facts clearly demonstrate that (i) Claimant was hired by Respondent to be the company's investment banker, (ii) he was obligated to solicit investors to purchase Respondent's securities, and (iii) he was to be compensated solely in exchange for capital raising. Notably, the "O" and "H" factors do not even require transaction-related compensation for a finding of unlicensed broker activities. Therefore, the Agreement itself requires unlicensed broker activities and is **void**.

c.    **Claimant Engaged in Unlicensed Broker Activities for Respondent.**

In addition to the express services under the Agreement, Claimant agreed to provide "**[o]ther services as mutually agreed.**" <u>Ex. B</u>, p.1. These services were

4

admitted in Claimant's testimony that he **sent e-mails and called over fifteen (15) prospective investors** to solicit investments in Respondent.  Claimant also testified and authenticated multiple e-mails that memorialized his efforts to arrange meetings and explain the general nature of the securities offering to prospective investors.[7] These facts demonstrate, at least, ABA#2 (engaging in solicitations), ABA#3 (discussing details about securities or making recommendations), K#6 (actively finding investors), O#4 (discussing details of securities transactions), H#1 (exchanging multiple e-mail communications concerning the investment), and H#2 (conveying the investor's questions to Respondent).

**d.    Claimant Has Made a Career as an Unlicensed Broker.**

Claimant's testimony reflected his long history as an unlicensed broker.[8] However, it also reflected his recent offer to perform **new** unlicensed broker activities for Respondent.  Specifically, Claimant stated:

- "I will retain 60% of all net proceeds [from Respondent's stock sales] and 40% will be sent back to the Company." Ex. D, para. C.

    - ABA#4 and K#2 (compensation on a transaction-related basis).[9]

- "I am prepared to assist the Company with any ongoing raises." Ex. D, para. D.

---

[7]    *See, e.g.*, Ex. C.

[8]    For example, in February 26, 2014, Claimant entered into an employment agreement in which he was entitled to "**a one-time $25,000 cash bonus once the Company completes a minimum private placement financing of $750,000.**" *See* Tauriga Sciences, Inc., 10-K (Mar. 31, 2016); *see also* NRS 47.130(2)(b) (permitting judicial notice of reliable public information).

[9]    This was an unlawful proposal to engage in an unregistered offering of securities to the public for the benefit of Respondent, which also would make Claimant a statutory underwriter who must register as a broker.  15 U.S.C. § 77b(a)(11).

- ○ ABA#1, K#4 and O#3 (participating in negotiations), ABA#2 (engaging in solicitations), ABA#3 (discussing details about securities or making recommendations), and K#6 (actively finding investors).

- "[Respondent will] provide me with compensation based upon successful [c]apital raised and success in broadening the shareholder base." Ex. D, para. F.

  - ○ ABA#4 and K#2 (compensation on a transaction-related basis).

- Claimant will travel to Istanbul to meet with an investor for a private investment who "also [is] not opposed to potentially taking a position in the open market at this time." Ex. D, para. G.

  - ○ ABA#1, K#4 and O#3 (participating in negotiations), ABA#2 (engaging in solicitations), ABA#3 (discussing details about securities or making recommendations), and K#6 (actively finding investors).

Claimant acted as an unlicensed broker for multiple issuers for more than a decade as a matter of public record, and the foregoing facts clearly demonstrate ABA#5 (previous involvement in the sale of securities), K#3 (selling the securities of another issuer), and O#6 (prior involvement in the sale of securities). Therefore, his prior activities and the newly proposed agreements require broker registration.

**e.**   **Claimant's Damages Request Reflects a Flawed Market Theory.**

Claimant has not briefed any reasoned theory of damages. Instead, his arbitrary claim for $900,000 is based upon what he thinks 500,000 shares of Respondent's stock might have been worth if he traded it with expert skill and discipline over an extended period of time. Even if Claimant possessed those abilities, there were no recurring conditions that could yield $900,000. It also is ironic that the skill set Claimant relies upon to justify his damages is identical to that

6

of a registered broker.[10]   Therefore, any credibility of Claimant on the issue of

damages also should be considered in the context of his unlicensed broker activities.

**f.**   **Conclusion.**

Claimant has spent his entire career in the gray market of unlicensed brokers.

In this case, Claimant's conduct can be described as soliciting private placements

and public stock trades, advising Respondent and prospective investors about

prospective investments, and advising Respondent on acquisitions.   These activities

fit squarely within the "O" and "H" factors, describe a Series 79 broker, and would

be denied no-action relief by the SEC.[11]   Therefore, Respondent respectfully

requests that the Arbitrator:   (i) dismiss Claimant's claim in its entirety; and (ii)

declare Respondent the sole prevailing party in this case.

Respectfully Submitted, this 3rd day of February, 2017.

/s/ Patrick E. Ogle, Esq.
Patrick E. Ogle, Esq.
*Attorney for Respondent*

---

[10]    It is unlikely that the SEC would be impressed by a public company CEO or employee who purports to have gained such trading expertise in his role as an insider and affiliate.

[11]    The SEC Staff, in its most recent **Denial** of No-Action Request to which it directs the public on its website, stated:

> The Staff believes that the introduction to [the issuer] of only those persons with a potential interest in investing in [the issuer]'s securities implies that [the finder] anticipates both "**pre-screening**" potential investors to determine their eligibility to purchase the securities, and "**pre-selling**" [the issuer]'s securities to gauge the investors' interest.

*See* Brumberg, Mackey, SEC No-Action Denial Letter (May 17, 2010).

# EXHIBIT "C"

# EXHIBIT "C"

## AMERICAN ARBITRATION ASSOCIATION

**SETH M. SHAW,**

**Claimant,**

vs.                                    **Arbitration No. 01-15-0005-6446**

**ROI LAND INVESTMENTS, LTD.,**

**Respondent.**

### <u>Respondent's Response to Claimant's Post-Hearing Brief</u>

Respondent ROI Land Investments, Ltd. ("<u>Respondent</u>") hereby files this response to the post-hearing brief of Seth M. Shaw ("<u>Claimant</u>").  Claimant begins his post-hearing brief stating there was no favorable testimony to Respondent at the hearing.  However, Claimant's testimony and the entire body of evidence supports Respondent's defenses that Claimant (i) is an unregistered broker, (ii) has been an unregistered broker for more than a decade, (iii) entered into a contract to provide unregistered broker services to Respondent, and (iv) offered to enter into multiple subsequent unregistered broker agreements with Respondent.

Claimant is the definitional personification of an unregistered broker and is required to hold a Series 79 designation with FINRA.  Despite his personal image, Claimant is not a savvy entrepreneur and public company executive.  Instead, every time he served as interim CEO of a public company, it was a shell.[1]

---

[1]    Notably, the definition of a 'shell' is found in Rule 144(i), headed "[u]navailability to securities of issuers with no or nominal operations and no or nominal non-cash assets."  Rule 144 itself is headed "[p]ersons deemed not to be engaged in a distribution and therefore not underwriters."  However, this is exactly the illegal activity by which Claimant makes a living.

1

Claimant testified that nearly every company for which he was an officer had multiple names with multiple unrelated (alleged) business purposes and had no or nominal operations and non-cash assets when he took office.  Moreover, each time those companies entered into a reverse merger with an alleged operating company, Claimant was demoted to VP, Strategic Planning or entered into a consulting agreement whereby he received transaction-based compensation for offering and selling securities.  Claimant testified that he has done this for decades--**it is illegal**.[2]

Claimant also testified about his allegedly masterful securities trading skills. Accordingly, Respondent introduced evidence of Claimant's offers to use those skills to engage in blatantly illegal public sales of Respondent's securities whereby Claimant would split proceeds with Respondent.[3]  When asked about these activities--**twice**--Claimant asserted that such activity was perfectly legal, and he boldly endorsed his actions.  When asked about Claimant's offer to solicit investors

---

[2]      *See, e.g.*, Order, *In re Roberts*, SEC Admin. Proc. File No. 3-16888 (Feb. 9, 2016).  In that very recent case, the SEC stated: "In a typical deal, [defendants] located a [] company seeking financing in the U.S. markets and negotiated to reverse merge the company's operating entity into one of the shells acquired by [defendants] for that purpose." *Id.*  Further, the SEC found that defendants "participated in key steps of the financing process on behalf of the parties to the deals by, among other things, directly soliciting investors and hiring agents to solicit investors; communicating with warrant holders on behalf of the entities; . . . [and] participating in discussions about how to structure financings . . . ." *Id.*  "As a result of [defendants'] regular participation in such activities as part of their business, each acted as an unregistered broker in violation of Section 15(a)(1) of the Exchange Act." *Id.*

[3]      Claimant is a statutory underwriter.  15 U.S.C. § 77b(a)(11).  Section 5 of the Securities Act makes it unlawful for a person to offer or sell securities, except pursuant to a registration statement or an exemption from registration.  Section 4(a)(4) of the Securities Act exempts certain broker transactions executed upon customers' orders, but it does not exempt the solicitation of such orders.  *See In the Matter of Owen V. Kane*, Exchange Act Release No. 23827 (Nov. 20, 1986), *aff'd*, 842 F.2d 194 (8th Cir. 1988).  However, reliance on Section 4(a)(4) is unavailable when the selling customer's part of the transaction is not exempt from Section 5, such as when the customer is a statutory underwriter.  *See* 17 CFR 230.144(g)(4).

in Respondent's public market for securities--**twice**--Claimant boasted that he did so routinely and believed it to be perfectly legal.  Claimant's profoundly misplaced beliefs do not make illegal acts legal, and there is no 'intent' element to the broker registration requirements or voiding of unregistered broker contracts.  Claimant knows the law.  He just hasn't been caught yet, and those prior unregistered broker activities require his registration as a broker and make the subject contract void.

Each of Claimant's legal positions in his post-hearing brief also are fatally flawed.  First, there is no statute of limitations on defenses, even if a cause of action could be based on facts giving rise to the defense, and Claimant has not cited any authority to the contrary.  Second, the *FV* case expressly **does not stand** for Claimant's assertion that the 'unwilling innocent standard' applies to preclude Respondent's defenses.[4]  Finally, Claimant testified that he was soliciting investors into the public markets pursuant to the contract, and evidence showed he offered to do so again for Respondent and share the profits.  This is exactly the type of activities that require investor protection and why contracts like these are void.

Respectfully Submitted, this 8th day of February, 2017.

/s/ Patrick E. Ogle, Esq.
Patrick E. Ogle, Esq.
*Attorney for Respondent*

---

[4]    "[Defendant] responds that the unwilling innocent standard is inapplicable here because it applies solely to 'the question of whether an unwilling innocent party . . . could enforce a contract despite its unlawfulness,' **not to whether a defendant . . . must be an unwilling innocent to defend** against a plaintiff's enforcement of an allegedly illegal contract." *Foundation Ventures LLC v F2G, Ltd.*, 2010 WL 3187294 *7 (S.D.N.Y. 2010).  This is Respondent's argument; however, the *FV* court said it "need not resolve this dispute because . . . neither the Contract nor [plaintiff]'s performance pursuant to it is illegal as a matter of law." *Id.* Here, the contract and Claimant's performance pursuant to it **are** illegal as a matter of law.

3